LAND,
J. Plaintiffs sued defendant for damages for the death of their minor son, alleged to have been killed on July 8, 1911, by the negligent operation of a locomotive of the defendant. After pleading the general issue the defendant averred that, if plaintiffs’ son was killed as alleged, his death was due to his own fault and negligence and to no fault or negligence on the part of the respondent. The cause was tried before a jury which rendered a verdict for $4,000 in favor of the plaintiffs. Defendant’s motion for a new trial was overruled by the court, and judgment was rendered pursuant to the verdict. The defendant has appealed.
According to the allegations of the petition, the minor, John J. Petrie, was run over by one of the locomotives of the defendant at the corner of Liberty and Euphrosine streets, and the locomotive struck the boy while it was proceeding baclnoard in the direction of the roundhouse of the defendant. The petition further alleges that the corner at which the boy was run over is one where numerous pedestrians cross the tracks of the defendant company, and where traffic is heavy, and that said locomotive rang no bell, and that there was no flagman at said crossing, and no one to warn the public, or John J. Petrie, of the danger.
The principal witness for the plaintiff was Westley Oaddin, a boy 13 years old. His testimony on the main issues of fact may be briefly stated as follows:
On the occasion in question Westley met John Petrie at the Liberty street bridge, and asked him where he was going. John replied he was going home, and proceeded towards the railroad tracks. When John was about to cross, he stopped and waited for a train going towards the river to pass, and after it passed, he walked over and was struck by a locomotive and tender, which was backing towards the roundhouse. The witness noticed that 71 was the number of the locomotive. John was knocked under the wheels and dragged a short distance, and the “train” kept on going until it got nearly to Freret street, a distance of about a block and a half, and then backed into the station. John was right by the bridge, and had a sack of vegetables on his shoulder, when the witness first saw him. Witness was not with John when he went to cross the track, but sat down on a plank by the canal office.
Cross-examined:
Witness saw both of the trains moving in opppsite directions. John Petrie “saw the two of them,” and when the train passed, going towards the river, he walked across that track and onto the other track, and when he put his foot on the latter the engine was about 10 feet from him. When the *302 witness first saw the two trains, one going to the river and the other to the roundhouse, they were about 10 feet apart, on different tracks. The confused testimony of the witness as to the relative position of the two trains, and as to the distance between them, and as to the distance between John Petrie and the second train, when he started to cross, and when he reached the second track, need not be stated, as the witness, on further examination, admitted that he “never saw 71 until she hit Petrie,” and did not know whether or not Petrie saw 71 before he was struck. The witness stated that he “took the number” of the engine at the time.
The witness, in answer to the question as to whereabout Petrie was struck on the track, answered, “a little bit before the switch,” and designated the point on a map of the locus in quo by a mark in the form of a large dot. We attach a copy of the map

for reference. This mark is near the point of the switch, which is 25 feet from the plank road. Further along, the witness stated that Petrie was hit at a point on the plank road, marked “A” on the map. There is a difference of 20 or more feet between the two marks, and the two statements of the witness cannot be reconciled.
Police Officer Fisher, an uncle of John Petrie, testified that he went to the scene of the accident, and found the 'body of the boy “cut all in two, mangled up,” about 15 feet from the plank road, and one of his feet or legs in the fork of the switch. Corporal Trinchard testified that he found the body of the boy about 20 feet from the plank walk on Liberty street “right in the switch.”
In behalf of the defendant, George Miller, foreman of switching crew engine, H. F. Gomes, and W. E. Barlow, switchman, and Thomas J. Joyce, engineer, all testified that on the occasion in question switch engine No. 71 was pulling 14 passenger cars across the plank road in the direction of the point of the switch and the figure 3, as shown on the map. These four witnesses were on the train pulled by engine No. 71, and the evidence, direct and circumstantial, shows that John Petrie was run over and killed by the trucks of one or both of the two last coaches of the train. Joyce and Barlow were on engine No. 71, and both swore that on the day in question no person was struck by the locomotive at or near the plank road. Miller testified that he was standing at the crossing to protect the switch, and never saw any cars go over the boy; that as the train was passing he got on the platform'of'the thirteenth car, and feeling a little jolt he looked on the other side and saw the boy under the coach. The boy was still alive, and raised himself half up. The train pulled by, and the witness left Switchman Comes to investigate. Comes testified, in part, as follows:
“I was on the last coach, and Foreman Miller said: ‘We ran over somebody, didn’t we?’ I looked back and said, ‘By God, we did,’ and he said: ‘You better jump off and see if you can get some information.’
“Q. Did you get off?
“A. Yes, sir.
“Q. 'Where was the boy lying?
“A. At No. 6 switch, about 25 or 30 feet north of Liberty street; I don’t know exactly; I just figure that many feet.”
*304 The fact that neither Miller nor Comes attempted to explain how the boy happened to get under the cars is a circumstance in favor of the truth of their statements. If they had been disposed to falsify, they could readily have sworn that the boy attempted to get on one of the cars, and slipped and fell beneath the trucks.
Plaintiffs’ theory of the case rests on the uncorroborated testimony of one witness, which, in itself, is confused and inconsistent, and which is contradicted on material points by the four witnesses for the defense. Our conclusion is that the evidence fails to show that the death of John Petrie was caused by the negligence of the defendant company.
The verdict and judgment are clearly against the preponderance of the evidence; and it is therefore ordered that the verdict and judgment below be set aside, and it is now ordered that plaintiffs’ suit be dismissed, with costs in both courts.